**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
03/12/99
THOMAS K. KAHN
CLERK

No. 97-9358

D. C. Docket No. 3:97-CR-06-03

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DON McCRANIE,
JACKSON JONES,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Georgia

**(March 12, 1999)**

Before DUBINA and BARKETT, Circuit Judges, and JONES*, Senior Circuit Judge.

DUBINA, Circuit Judge:

_____

*Honorable Nathaniel R. Jones, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

This case involves fraudulent voting activities. Specifically, these activities include vote buying, vote selling, multiple voting, and votes casts by felons and deceased voters.

Defendant Jackson Jones ("Jones"), sheriff of Dodge County, Georgia, is charged in Counts I and II of a federal indictment with two separate conspiracies to buy votes in violation of 18 U.S.C. § 371[1] and 42 U.S.C. §§ 1973i(c)[2] and (e)[3]. Jones is also charged

---

[1] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

[2] "Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico."

[3] "(1) Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(2) The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

(3) As used in this subsection, the term "votes more than once" does not

2

in Count III with misprision of a felony, in violation of 18 U.S.C. § 4. Defendant Don McCranie ("McCranie"), commissioner of Dodge County, Georgia, is only charged in the Count II vote buying conspiracy. The defendants were tried together and convicted on all counts. After sentencing, they perfected their appeals.

## I. BACKGROUND FACTS

This case involves two conspiracies by the opposing candidates for county commissioner and their respective supporters to buy votes in the July 9, 1996, Dodge County primary election in Eastman, Georgia. McCranie's challenger was Doyce Mullis ("Mullis"), the former Dodge County commissioner. Jones, the thirty-year incumbent sheriff of Dodge County, was charged in both conspiracies, because he had supporters in both of the county commissioner camps who bought votes for him. The election was a mixed federal-state election because there were candidates for the United States Senate and the House of Representatives on the ballot, along with the contests for county commissioner, sheriff, and numerous other local races.

In the county commissioner's race, McCranie won by only 31 votes. Jones' sole opponent for sheriff was Theo "Ted" Parkerson, Jr. ("Parkerson"). Jones won the disputed primary election by only nine votes.

---

include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the voting in two jurisdictions under section 1973aa-1 of this title, to the extent two ballots are not cast for an election to the same candidacy or office."

3

The losing candidates in the two races, Mullis and Parkerson, filed petitions contesting the election results in the Dodge County Superior Court. The Dodge County Superior Court voided the July 9th primary election results due to numerous "irregularities," and that decision was affirmed by the Supreme Court of Georgia. *See McCranie v. Mullis*, 478 S.E. 2d 377 (Ga. 1996). A new election occurred and McCranie won again, but Jones was defeated by Parkerson.

A joint federal-state investigation revealed widespread election fraud in both the McCranie and Mullis camps. Both sides bought votes. The two separate conspiracies to buy votes in this election were the "McCranie-Jones" conspiracy and the "Mullis-Jones" conspiracy. As previously stated, Jones had supporters who bought votes in both camps.

The government's evidence at trial included the testimony of several co-conspirators who bought votes for the candidates. Cooperation witness Charles Deloach ("Deloach") testified about Jones' participation in the "Mullis-Jones" vote buying conspiracy. Early in the campaign Jones and Mullis met with Deloach at the county jail and discussed how much money to pay various voters for voting a certain way. The parties discussed payment of $20 per voter.

Donald Kennedy ("Kennedy"), another Mullis and Jones supporter, testified that four or five days before election day, Jones handed him $4,000 in $20 bills "to pay haulers." (R2-140-42). Mullis testified that when he gave cash to Kennedy and others, it was understood, without saying, how the cash was to be used. Kennedy stated that vote buying was a way of life in Dodge County politics.

4

In the "McCranie-Jones" conspiracy, six of the vote buyers were McCranie's employees at the Dodge County road department. Cooperating government witness Obbie Mann ("Mann") testified that employees were required, as part of their jobs, to campaign for McCranie. Mann testified that McCranie would sometimes deliver money for buying votes to the road department. Mann also testified that on the day before the election, McCranie handed him $1,000 in $20 bills to be used for buying votes. Moreover, Mann testified that McCranie delivered another $2,000 in cash to him in $20 bills on election day. In addition to live testimony, the government also introduced bank records showing that during the campaign McCranie and Jones each obtained $15,000 in $20 bills from an Eastman bank.

The investigation revealed that most of the illegal vote buying occurred during the absentee voting period prior to election day. The investigation disclosed that for the challenged primary, 1,647 absentee ballots were issued for a voting population of approximately 11,000 voters. In other words, approximately 15% of all ballots issued were absentee ballots. State election officials advised that issuance of more than 10% of absentee ballots for a registered voter population was considered extremely high.

The Dodge County election superintendent testified that 1,500 absentee votes (out of less than 8,000 total votes cast in the election), was unprecedented for Dodge County. Out of approximately 1,500 absentee ballots counted in the sheriff's race, Jones received 1,047 votes and his opponent, Parkerson, received only 449 votes. In the county commissioner's race, McCranie received 693 absentee votes, while Mullis received 794.

5

Incredibly, each of the two camps--McCranie and Mullis–actually set up tables inside the courthouse at opposite ends of the hall, where supporters on both sides openly bid against each other to buy absentee votes.

At trial, a Dodge County magistrate described the rowdy courthouse atmosphere during the absentee voting period as "a successful flea market." (R3-446). One of the vote buyers in the Mullis camp also testified that the open bidding for votes was "[l]ike an auction." (R2-257).

Vote buyers for both sides paid the voter $20 to $40 after the voter cast his or her absentee ballot. Sometimes, the cash payment occurred in the courthouse bathroom. More frequently, the voters received their payment while the "haulers" drove them home after they voted. McCranie's haulers generally drove the absentee voters to the courthouse to see Bryant Williams ("Williams") whose primary role was to physically mark the voters' absentee ballots for McCranie and Jones, no matter what the voters' preferences were. Williams was not a county employee but a volunteer campaign worker for McCranie. Williams' wife, however, was McCranie's clerk at the Dodge County Courthouse. Approximately 40 absentee voters also testified at trial that they were paid by one side or the other to vote for either Mullis and Jones or McCranie and Jones.

## II. STATEMENT OF THE ISSUES

(1) Whether federal jurisdiction exists in a vote buying case involving a mixed federal-state election with unopposed federal candidates on the ballot.

6

(2) Whether the evidence was sufficient to support the guilty verdicts.

(3) Whether the district court abused its discretion by instructing the jury on aiding and abetting in relation to the misprision of a felony count.

(4) Whether the district court's sentencing enhancements for role in the offense and obstruction of justice were clearly erroneous.

(5) Whether the district court's ruling which struck a prejudicial portion of the testimony of a government witness constituted improper curtailment of cross-examination where the defendant rejected an opportunity to further cross-examine the witness.

(6) Whether the district court abused its discretion in refusing to sever the trials of McCranie and Jones in this vote buying conspiracy case.

### III. <u>DISCUSSION</u>

Whether federal jurisdiction exists in this type of fraudulent voting activities case is a question of first impression in this circuit, so it merits discussion. The jurisdiction issue presents a question of law; accordingly, the *de novo* standard of review is applicable. *See United States v. Johns*, 984 F.2d 1162, 1163 (11th Cir. 1993).

After reviewing the record, we conclude that there is no merit to any of the remaining issues McCranie and Jones present in this appeal. Accordingly, we affirm the district court's disposition of those issues without further discussion.[4]

---

[4]       See 11th Cir. R. 36-1.

McCranie and Jones first allege that the district court lacked jurisdiction in this case because the federal candidates in the primary election lacked opposition. As a starting point, we observe that the federal vote buying statute, 42 U.S.C. § 1973i(c), and the multiple voting statute, 42 U.S.C. § 1973i(e), plainly prohibit voting fraud "in any general, special, or primary elections held solely or in part for the purpose of electing federal candidates." (Emphasis added). The government correctly notes that McCranie and Jones cite no authority in support of their jurisdictional argument. None exists. The only circuit to address this identical question we are faced with in this appeal is the Seventh Circuit in *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994). *Cole*, an opinion authored by Senior Circuit Judge John C. Godbold, sitting by designation, held that federal jurisdiction is satisfied so long as a single federal candidate is on the ballot. *Id.* at 307. Additionally, the court held that federal jurisdiction exists even if the federal candidate is unopposed because fraud in a mixed election does have an impact "on the integrity of the election." *Id.* at 307.

The court in *Cole* correctly observed that the federal election fraud statutes were implemented to protect two aspects of a federal election: the actual results of the election and the integrity of the process of electing federal officials. In the present case, we agree with the government that McCranie's and Jones' fraudulent conduct corrupted the election process, if not the election results. *Id.*

Moreover, the government maintains, and we agree, that the Constitution's Necessary and Proper Clause, (Art. I, § 8, cl. 18), along with Art. I, § 4, empowers

8

Congress to regulate mixed elections even if the federal candidate is unopposed. *See United States v. Bowman*, 636 F.2d 1003 (5th Cir. Unit A Feb. 1981). Although there is no Eleventh Circuit case directly on point with the jurisdictional question presented in this case, *Bowman*, which is binding on us,[5] is a factually similar case and is not inconsistent with *Cole*. The language of §1973i(c) and (e) clearly gives us jurisdiction over elections held solely or in part for the purpose of selecting a candidate for the United States Congress. However, the defendants argue that language in *Bowman* creates an additional requirement that in order for us to have jurisdiction, the fraud that is directed toward the state election must "affect" or "corrupt" the outcome of the federal election. We do not agree with this narrow reading of *Bowman*. The language in *Bowman* not only prohibits any fraudulent activity that affects the outcome of a federal election but also prohibits any activity that has the potential to affect "the integrity and purity" of an election. *Bowman*, 636 F.3d at 1012. Again, whether the federal candidate is opposed or unopposed is of little consequence because the integrity of a mixed federal-state election is marred by fraudulent voting activities, even if these activities are only directed toward the state elections. *See Cole*, 41 F.3d at 306.

---

[5]     In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

In conclusion, we adopt the reasoning of the Seventh Circuit in *Cole* and hold that the district court had jurisdiction to try McCranie and Jones for voter fraud in violation of § 1973i(c)and (e) despite the presence of uncontested federal races on the same ballot with contested state and local races. We therefore affirm McCranie's and Jones' convictions and sentences.

**AFFIRMED.**